UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KEVIN ALLEN,

                Petitioner**,**

             v.

THE STATE OF NEW YORK,

                Respondent.

_____

**DECISION AND ORDER**

13-CV-0991-JJM

Kevin Allen, *pro se*, brings this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his conviction on charges of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree in New York State Supreme Court, Erie County on November 18, 2009 [1]. [1]  He was sentenced of twenty-five years to life imprisonment. Id.

The parties have consented to my jurisdiction in this case [14].  For the following reasons, the petition is denied.

**BACKGROUND**

Petitioner was convicted of providing a gun to Ricky R. Scott, which Scott then used to kill Lamar Williams on May 21, 2006. At trial, Kysun Romer testified that on that date he went to the Tralfamadore Café ("Tralf") in Buffalo with Larry Kemp and an individual known

---

[1]   Bracketed references are to the CM/ECF docket entries.

as "Red", to see a concert by rap artist Jim Jones (T. 225, 255). [2]  Inside the Tralf lobby, Mr.

Kemp got into a fight with Jermaine "Pops" Varner (T. 227). Mr. Kemp believed Mr. Varner had

something to do with his brother's murder. Id.

The concert was sold out, and those in the lobby were asked to leave the building

(T. 257, 354).  Once outside, Mr. Romer, Mr. Kemp and "Red" met up with petitioner and Mr.

Scott (T. 229-230). Mr. Kemp was upset and stated that he wanted Mr. Varner killed (T. 231).

Initially, Mr. Kemp sent "Red" to kill Mr. Varner (T. 232). "Red" walked down to the street

waiting for Mr. Varner's van to drive by (T. 233). Before Mr. Varner came by, Mr. Kemp called

"Red" back. Id.

Mr. Kemp then stated that he would pay $10,000 for someone to kill Mr. Varner

(T. 234).[3] Mr. Scott stated that he would do it. Id. Mr. Kemp gave Mr. Scott approximately

$5000 in cash which he had with him (T. 235, 325). Mr. Romer testified that he then observed

petitioner hand Mr. Scott a handgun (T. 236), and advise Mr. Scott: "Here come the van right

now" (T. 237). Mr. Scott walked down to the street, walked up to the van and shot the driver (T.

237) – who turned out to be Mr. Williams, not Mr. Varner (T. 372). Id.[4]

Jamario Reed testified that he and his brothers also went to the Jim Jones concert

but were unable to get in (T. 393).  Mr. Reed testified that he saw petitioner standing outside the

Tralf, a couple of feet away from where he was standing with his brothers (T. 395-96).[5]  He

---

[2]   All references "(T. ___)" refer to the transcript of the trial which commenced on October 6, 2009. A previous trial on these charges had commenced on July 16, 2009, but ended in a mistrial due to the need to disqualify a member of the jury.

[3]   Mr. Romer stated that Mr. Kemp offered "ten bones" which meant $10,000. Id.

[4]   Dwight Hicks, a parole officer from Rochester, was working security for the Tralf and the Groove Nightclub at the time of the shooting (T. 337). He testified that a large crowd had exited the Tralf and traffic was bumper to bumper (T. 343).

[5]   Mr. Reed testified that he had known petitioner for approximately two years (T. 395).

testified that he saw petitioner hand Mr. Scott a gun and then heard petitioner tell Mr. Scott: "There he go" (T. 396-97, 401).  According to Mr. Reed, Mr. Scott then "walked up to the van and shot the dude" (T. 397, 401).

Jeriel Cobb, Mr. Reed's brother, also testified that he had gone to Tralf with his brothers on May 21, 2006, but did not get in to see the concert (T. 472).  He stated that he saw petitioner outside of the Tralf with Mr. Kemp and Mr. Scott (T. 473).[6] Mr. Cobb testified that he saw petitioner hand Mr. Scott a pistol and point toward the traffic (T. 477).  According to Mr. Cobb, Mr. Scott then walked up to a van and "fired off a shot inside a window". Id. Mr. Cobb testified that Mr. Scott came back to where they were standing and handed the gun back to petitioner (T. 478).[7] Mr. Reed and Mr. Cobb both also testified that several days after the shooting, petitioner, Mr. Scott and others came by their family's home on Box Street and told them to "keep your mouth shut" (T. 449-50; 480-83).

The jury found Mr. Scott and petitioner guilty on all charges (T. 694-98). On November 18, 2009, petitioner was sentenced to 25 years to life for murder in the second degree; 15 years plus five years of post-release supervision for criminal possession of a weapon in the second degree; and three to seven years for criminal possession of a weapon in the third degree.[8]

---

[6]   He stated that he was familiar with petitioner (T. 473).

[7]   James Reed, who is Mr. Reed's and Mr. Cobb's brother, was also called as a witness during the trial (T. 351). Although he had previously provided testimony to the Grand Jury, and had also testified at the initial trial in this case, he was unable to recall the salient facts when questioned at the retrial (T. 357-66).

[8]   See the transcript of the November 18, 2009 sentencing proceeding, at page 6, which was filed separately from the trial transcript.

## PROCEDURAL HISTORY

Petitioner appealed his conviction to the New York State Supreme Court Appellate Division, Fourth Department, asserting the following claims: (1) that he had a right to be present during a pretrial motion for severance; (2) that the trial court erred in responding to a jury note by not providing the jury certain instructions requested by defense counsel; (3) that the admission of prejudicial testimony, refusal to allow admission of defense evidence, and failure of petitioner to be present for questioning of a juror, cumulatively violated petitioner's due process rights; (4) that the verdict was against the weight of the evidence and that there was an insufficiency of evidence to support the conviction; and (5) that his sentence was unduly harsh. *See* Brief for Appellant attached as Exhibit B to the state court records filed on January 13, 2014.

The Fourth Department unanimously affirmed petitioner's conviction on March 16, 2012,[9] and his application for leave to appeal to the New York State Court of Appeals was denied June 25, 2012.[10] He did not seek a writ of *certiorari* from the United States Supreme Court.

This federal petition for *habeas corpus* relief was filed on October 1, 2013[1]. In a memo attached to his petition, petitioner asserts the following claims for *habeas* relief: (1) that it was error not to sever his trial from Mr. Scott's (Petition [1], p. 18); (2) that the trial judge erred by failing to include an instruction requested by the defense in response to a note from the jury (id., p. 22); (3) that the trial judge failed to strike prejudicial testimony; (id., p. 26); (4) that the trial judge erred by failing to admit two videos (id., p. 27); (5) that petitioner's rights were

---

[9]   People v. Allen, 93 A.D.3d 1144 (4th Dep't. 2012).

[10]   People v. Allen, 19 N.Y.3d 956 (2012).

violated because a juror was questioned outside of his presence (id., p. 28); and (6) that the evidence was constitutionally insufficient to convict him (id., p. 35).

On December 15, 2015, petitioner filed a writ of error *coram nobis* with the Fourth Department. *See* Motion to Stay [22], Exhibits A and E. In that application, petitioner argued that trial counsel was ineffective because he failed to use a declaration against penal interest purportedly made by Scott which petitioner contends was exculpating, and that his appellate counsel was ineffective for failing to assert that trial counsel was ineffective. Id., Exhibit E, pp. 41-78 of 213. The Fourth Department summarily denied the application for *coram nobis* relief on March 18, 2016.[11]

In 2016, petitioner filed a §440.10[12] motion, which appears to be currently pending in State of New York Supreme Court, Erie County. Id., Exhibit F, p. 82 of 213. In that motion, petitioner asserts that his trial counsel was ineffective. Id., Exhibit F, p. 83 of 213.


## TIMELINESS OF THE PETITION

"The Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] requires a state prisoner whose conviction has become final to seek federal *habeas corpus* relief within one year. Evans v. Chavis, 546 U.S. 189, 191 (2006) (citing 28 U.S.C. §2244(d)(1)(A), (d)(2)). AEDPA tolls this one-year limitations period for the "time during which a properly filed application for State post-conviction or other collateral review . . . is pending." Id.

Petitioner was sentenced on November 18, 2009. Because he timely filed a notice to appeal his conviction, the AEDPA one year limitations period would not begin running until his appeal was no longer pending. On June 25, 2012, the New York Court of Appeals denied

---

[11]  People v. Allen, 137 A.D.3d 1632 (4th Dep't. 2016).

[12]  N.Y. Crim. Proc. Law ("CPL") §440.10.

petitioner's leave to appeal from the Fourth Department's affirmance of his conviction. Petitioner did not seek *certiorari* from the Supreme Court; therefore, the statute of limitations began running on September 24, 2012, when his ninety-day window for seeking *certiorari* expired. *See* <u>Williams v. Artuz</u>, 237 F.3d 147 (2d Cir. 2001) (state prisoner's conviction becomes final for purposes of the one-year limitations period under the AEDPA when certiorari has been denied by the United States Supreme Court or the time for seeking certiorari has expired). Thus, petitioner had until September 24, 2013 to file his petition.

Allen's petition for *habeas corpus* relief was filed by the court clerk on October 1, 2013, seven days after his time to file had expired. However, pursuant to the "prisoner mailbox rule", a *pro se* prisoner's papers are considered filed when they are handed over to prison officials for forwarding to the court. *See* <u>Houston v. Lack</u>, 487 U.S. 266 (1988); <u>Bradley v. LaClair</u>, 599 F. Supp. 2d 395 (W.D.N.Y. 2009) (applying the rule to federal *habeas* petitions).

The exact date on which petitioner handed over his petition to prison officials is not clearly reflected in the record. However, the envelope in which the court received the petition included a letter dated September 17, 2013, addressed to the Clerk of the Court. *See* September 17, 2013 Letter [3]. That letter requested that the petition be backdated to the date of the letter, citing the prisoner mailbox rule.  Additionally, the petition is dated September 16, 2013. The date on which a petition has been signed is presumed to be the date on which the prisoner handed over the document to prison officials unless rebutted by contrary evidence. *See* <u>Johnson v. Coombe</u>, 156 F.Supp. 2d 273, 277 (S.D.N.Y. 2001).

Respondent has not presented contrary evidence to rebut the contention that petitioner handed over the petition on September 17, 2013. Therefore, the petition is timely.

## EXHAUSTION

It is well settled that a federal court may not consider a petition for *habeas corpus* unless the petitioner has exhausted all state judicial remedies. *See* 28 U.S.C. §2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275 (1971); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997). In order to exhaust a federal constitutional claim for the purposes of federal *habeas* review, the substance of the federal claim, both legal and factual, must be apparent from the petitioner's presentation to the state court. Picard, 404 U.S. at 275-76. "The claim presented to the state court, in other words, must be the 'substantial equivalent' of the claim raised in the federal *habeas* petition". Jones v. Keane, 329 F.3d 290, 295 (2d Cir. 2003). Generally, this involves the completion of one full round of appellate review, meaning that the highest state court so empowered must have been presented with the opportunity to consider the petitioner's federal constitutional claim. Picard, 404 U.S. at 275–76.

However, "[f]or exhaustion purposes, 'a federal *habeas* court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred'". Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991). Under such circumstances, a petitioner "no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. Section 2254(b)". Id. When a petitioner no longer has "remedies available" in the state courts because he is procedurally barred by state law from raising such claims, the *habeas* court may deem the claims exhausted but procedurally defaulted. Id. at 120-21.

The procedural bar that gives rise to the finding that the claim should be deemed exhausted works a forfeiture and precludes litigation of the merits of the claim, absent a showing of cause for the procedural default and prejudice resulting therefrom, or by demonstrating that

the failure to consider the claim will result in a fundamental miscarriage of justice (*i.e.*, actual innocence). Wainwright v. Sykes, 433 U.S. 72, 87-91(1977).

Here, all of the claims in the petition appear to have been presented to the Fourth Department upon direct appeal. However, as discussed below, several of the claims were deemed to be procedurally barred.

## MOTION FOR STAY AND ABEYANCE

On June 6, 2016, petitioner filed a motion for a stay and abeyance of his federal petition [22]. Petitioner seeks a stay, *inter alia*, to allow him to establish cause and prejudice for the procedural bars raised by the Fourth Department in the denial of his appeal. Motion to Stay [22], ¶18.

The Fourth Department found that petitioner failed to preserve his claims relating to the denial of severance, the trial judge's response to various notes from the jury, the prejudicial testimony by Cobb, and the mid-trial interview (with counsel) of a juror.  People v. Allen, 93 A.D.3d at 1145-46. In his state court *coram nobis* proceedings and the §440.10 motion, petitioner seeks to establish cause and prejudice for any failure to preserve these issues, by asserting that his trial counsel was ineffective. Motion to Stay [22], Exhibits E and F. Additionally, the petitioner requested expansion of the court record, assignment of counsel, and additional discovery. Id. at ¶36.

The Supreme Court has held that district courts have the discretion to issue stays in *habeas corpus* proceedings. Rhines v. Weber, 544 U.S. 269 (2005). "A stay should be granted when a court finds (1) 'good cause' for petitioner's failure to exhaust his claims prior to filing the petition; (2) the unexhausted claims are 'potentially meritorious'; and (3) there is no indication

that petitioner 'engaged in intentionally dilatory litigation tactics'". <u>Sherrod v. Artus</u>, 2016 WL 3459539 at *2 (W.D.N.Y. 2016) (*citing* <u>Rhines</u>, 544 U.S. at 277-78).

      Here, in order to qualify for a stay under <u>Rhines</u>, petitioner must show "good cause" for the four year delay from the time he was put on notice of these issues (by the Fourth Department's denial of his appeal) until the time he filed the §440.10 motion and the motion for stay. Petitioner asserts that his status as a *pro se* prisoner with no legal experience should excuse the delay. Motion to Stay [22], ¶¶ 89, 90.

      Relying on *pro se* status does not establish "good cause" to justify an over four year delay. *See e.g.* <u>Smith v. McKee</u>, 598 F.3d 374, 385 (7th Cir. 2010) (a petitioner's *pro se* status does not constitute cause in a cause and prejudice analysis). "Basing a finding of good cause upon *pro se* status 'would render stay-and-abey[ance]  orders routine' and thus run afoul of <u>Rhines</u> and its instruction that district courts should only stay mixed petitions in 'limited circumstances'". <u>Fletcher v. Rednour</u>, 2011 WL 499305 *4 (S.D. Ill. 2011) (*citing* <u>Wooten v. Kirkland</u>, 540 F.3d 1019, 1024 (9th Cir. 2008)).

      Petitioner has not shown "good cause" necessary to warrant a stay and abeyance in this case.  In addition, petitioner's motion for a stay and abeyance is also denied because, as discussed below, his procedurally barred claims are meritless.[13] Because the motion for stay and

---

[13]   Petitioner attached a proposed amended petition for *habeas corpus* relief which he presumably intended to file after the resolution of his §440.10 motion. This amended petition includes the claims asserted in his original petition, plus claims of ineffective assistance by trial and appellate counsel. Motion to Stay [22-1], Exhibit G. Petitioner states that the proposed petition is "still not finished". Motion to Stay [22], ¶88. Petitioner's proposed ineffective assistance of counsel claims are based upon the issues relating to the severance motions, the handling of the jury and jury notes, the failure to have the videos admitted, the failure to obtain suppression of the testimony of Mr. Cobb, Mr. Romer and Mr. Reed, and the failure to file a post-conviction §440.10 motion. Motion for Stay [22-1], pp. 156-92 of 213. All but the last of these issues underlying petitioner's ineffective assistance claims are addressed herein and found to lack merit. While I need not reach the issue of ineffective assistance of counsel, it does not appear that petitioner has articulated a basis warranting relief under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

abeyance is denied, petitioner's additional requests for expansion of the court record, assignment of counsel, and additional discovery are also denied.


## ANALYSIS

### A.   Standard of Review

Where a petitioner challenges a state court's merits-based ruling, the federal district court reviews the state court's decision under the deferential AEDPA standard:

> "An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. §2254(d)(1)-(2).

A state court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,'" the state court arrived at an opposite result. Evans v. Fischer, 712 F.3d 125, 132 (2d Cir. 2013) (*quoting* Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case". Williams, 529 U.S. at 413. A federal court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents". Harrington v. Richter, 562 U.S. 86, 102 (2011).

When deciding whether a state court has made an unreasonable determination of facts, federal courts must presume that the facts determined by state courts are correct; therefore, the petitioner has the burden to rebut the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. §2254(e)(1). A "state court's finding might represent an unreasonable determination of the facts where . . . reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding, or where the court ignored highly probative and material evidence". <u>Cardoza v. Rock</u>, 731 F.3d 169, 178 (2d Cir. 2013). However, "even if the standard . . . is met, the petitioner still bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated". <u>Id.</u>

**B.      Severance**

Prior to the initial trial in this case, before the commencement of a suppression hearing, Daniel J. Dubois, counsel for Mr. Scott, stated that his client "had expressed some interest in discussing the possibility of a plea in this case", and that "the conditions that my client wanted to put forward was that he take a plea potentially and that his co-defendant would take a walk and the charges would be dismissed". Transcript of July 2, 2009 hearing, p. 5. According to Mr. DuBois, Assistant District Attorney Lawrence M. Schwegler, responded that Mr. Scott could consider a plea, but that he intended to proceed with the prosecution against petitioner. <u>Id.</u> Mr. DuBois stated that he placed that on the record because he "just wanted my client to know that I tried". <u>Id.</u>

On July 14, 2009, the day before the commencement of the original trial, Michael O'Rourke, counsel for petitioner, moved to sever based upon the statement made by Mr. DuBois

during the July 2, 2009 hearing.  Transcript of July 14, 2009 proceeding, p.3.  Mr. O'Rourke

stated that it was his understanding that Mr. Scott was willing to testify that petitioner did not

hand him the gun used to shoot Mr. Williams. Id., p. 5. According to Mr. O'Rourke, he

understood that Mr. Scott would not testify at a joint trial, but that after a separate trial in which

he was convicted or acquitted, Mr. Scott would provide testimony on behalf of petitioner. Id., p.

4. Mr. O'Rourke also suggested that severance was appropriate because both defendants would

attempt to deflect responsibility for the crime onto each other. Id., p. 6.

ADA Schwegler responded that he was not privy to any conversations between

the respective defense counsel or as to what Mr. Scott "may or may not say". Id., p. 7. He noted

that Mr. Scott had not, in fact, made any statement, and that Mr. DuBois' statement at the July 2,

2009 hearing was merely a continued attempt at plea negotiations. Id., p. 12. He stated that the

motion to sever was "an attempt to manipulate these proceedings . . . a dilatory tactic on

[petitioner's] part who has made complaints that he wanted a new trial part, he wanted the matter

adjourned and so forth". Id., pp. 7-8.  ADA Schwegler opposed the request for severance,

arguing that it was untimely and that the defendants acted in concert to accomplish the crime. Id.,

pp. 8-9.  He also noted that the proof against both defendants was supplied by the same evidence.

Id., p. 9. Both Mr. O'Rourke (id., p. 6) and ADA Schwegler (id., p. 9) acknowledged that

severance was subject to the court's discretion.

Petitioner argues that the denial of his severance motion violated his rights.

Petition [1], p. 4. He raised this issue in his direct appeal to the Fourth Department, which held

that the trial court did "neither abused nor improvidently exercised its discretion" by denying the

motion to sever. People v. Allen, 93 A.D.3d at 1144-45.  The Fourth Department stated:

"Contrary to defendant's contention, there was no irreconcilable conflict between the defense theories . . . . Here, neither defendant nor the codefendant attempted to blame the other for the shooting, and both defendants generally took the same defense approach of attempting to demonstrate that the People could not identify the codefendant as the shooter. Moreover, there was no significant danger that a conflict between the defenses would lead the jury to infer defendant's guilt."

Id. at 1145.

In the context of a federal *habeas* petition, "the decision [of] whether to grant a severance is 'committed to the sound discretion of the trial judge.' " Grant v. Hoke, 921 F.2d 28, 31 (2d Cir. 1990). Generally, "[j]oinder rules are a matter of state law and 'federal *habeas corpus* relief does not lie for errors of state law.' " Funches v. Walsh, 2006 WL 1063287, *8 (S.D.N.Y. 2006); *see also* Mercedes v. Herbert, 2002 WL 826809, *5 (S.D.N.Y.  2002) ("A trial court's denial of a severance motion is considered 'virtually unreviewable' " (*quoting* United States v. Friedman, 864 F.2d 535, 563 (2d Cir. 1988)).

Nevertheless, federal courts may grant *habeas corpus* relief where a trial court's denial of a severance motion rises to the level of a due process violation. Id.  However, such relief may only be granted where the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict". Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). The Second Circuit has "recognized that a joint trial is fundamentally unfair where codefendants present mutually antagonistic defenses." Grant, 921 F. 2d at 31.  However, "[m]ere antagonism between defenses is not enough".  United States v. Serpoosh, 919 F.2d 835, 837 (2d Cir. 1990). The standard is not met where "codefendants seek to place the blame on each other". Id. To find a mutually antagonistic defense, a petitioner must show that the conflict is so irreconcilable that acceptance of one defendant's defense will necessarily lead the jury to convict the other. Id. at 837-38. Accordingly, in cases of antagonistic defenses, severance is required only where "the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony

offered on behalf of a codefendant be disbelieved," United States v. Tutino, 883 F.2d 1125, 1130 (2d Cir. 1989), or where "the jury will infer that both defendants are guilty solely due to the conflict". Serpoosh, 919 F.2d at 838.

Here, the Fourth Department's finding that petitioner and Mr. Scott did not present conflicting defense theories is not an unreasonable application of the facts in light of the evidence presented.  At trial, the defendants essentially used the same strategy: neither defendant called a witness, and both attempted to undermine the credibility of the government's witnesses. The great majority of time on cross examination was used to question the motivation of witnesses to testify (T. at 240-254, 271-276, 279-303, 317-18, 404-05, 430-35, 494-520, 529-532).

Petitioner's argument that severance should have been granted so that Mr. Scott could have testified that petitioner did not give him the gun used to kill Mr. Williams is also unavailing. "When a defendant moves for a severance because he asserts a codefendant would offer exculpatory testimony at a separate trial, four factors must be examined: (1) proof that a codefendant would waive his Fifth Amendment privilege and testify at a severed trial; (2) whether exculpatory testimony would be cumulative; (3) the policy favoring judicial economy, and (4) whether it is likely that the offered testimony would be subject to effective impeachment." United States v. Cardascia, 951 F.2d 474, 485 (2d Cir. 1991).

Initially, the record does not reflect the scope of testimony, if any, that Mr. Scott would have provided had he testified.[14] It was asserted only that he would testify that petitioner did not give him the gun. In light of the testimony from three other witnesses stating that they

---

[14]    Indeed, the record does not reflect any actual statement, written or verbal, made by Mr. Scott to the effect that he would testify on behalf of petitioner. Contrary to petitioner's conclusory arguments (Motion to Stay [22-1], pp. 156-66 of 213), petitioner has not demonstrated that the representations made by Mr. DuBois constitute a statement against penal interest made by Mr. Scott or created a conflict on the part of Mr. O'Rourke in defending petitioner.

- 14 -

saw petitioner give Mr. Scott the gun, the jury would be free to discredit Mr. Scott's testimony, particularly if he did not present persuasive evidence as to where he did obtain the gun. Thus, any such testimony from Mr. Scott would likely have been subjected to effective impeachment.

In any event, the record in this case does not reflect that Mr. Scott agreed to waive his Fifth Amendment privilege. Indeed, petitioner points to Mr. Scott's unwillingness to waive his Fifth Amendment right as a basis for his motion for severance. Petition [1], p. 4. *See* United States v. O'Connor, 650 F.3d 839, 859 (2d Cir. 2011) ("a defendant's professed desire to elicit trial testimony from a codefendant does not require a severance where there is no showing of a likelihood that the codefendant would waive his Fifth Amendment privilege and testify at a severed trial").

Several circuits have held that severance is not required where, as here, a codefendant conditions his testimony upon being tried before the other defendant. *See* United States v. Smith, 46 F.3d 1223, 1231 n. 3 (1st Cir. 1995) ("an offer to testify, conditioned on one defendant being tried before the other, fails to satisfy the elements of a *prima facie* case for severance") *citing* United States v. Washington, 969 F.2d 1073, 1080 (D.C. Cir. 1992); United States v. Blanco, 844 F.2d 344, 352–53 (6th Cir. 1988); United States v. Haro-Espinosa, 619 F.2d 789, 793 (9th Cir. 1979); United States v. Becker, 585 F.2d 703, 706 (4th Cir. 1978)). The Supreme Court has not clearly established that severance is required under the circumstances present in this case.

Petitioner also argues that because neither he nor Mr. O'Rourke were present for a severance motion made by Mr. DuBois on behalf of Mr. Scott prior to the second trial, he was "denied his fundamental right to be present at a material stage of the proceeding as well as his

right to counsel at that proceeding". Petition [1], p. 5. The Fourth Department determined that petitioner failed to preserve this issue for appellate review. People v. Allen, 93 A.D.3d at 1145.

A state court's finding of procedural default will bar federal *habeas* review of the federal claim unless the petitioner can show "cause" for the default and "prejudice attributable thereto", or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice. " Harris v. Reed, 489 U.S. 255, 262 (1989). Ineffective assistance of counsel can serve as "cause" excusing procedural default. Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016).

Even if petitioner were able to able to demonstrate cause, this claim must still be denied. Prior to the second trial, Mr. DuBois moved for severance because Mr. O'Rourke had questioned one of the prosecution's witnesses about his prior identification of Mr. Scott from a photo array during the first trial. *See* August 3, 2011 Brief for Appellant, p. 10. As had been argued with respect to petitioner's severance motion prior to the first trial, Mr. DuBois asserted that severance was warranted because he intended to adopt an adversarial stance toward petitioner in the second trial. Id., p. 11. Such an argument, without more, does not meet the standard articulated under Grant, Serpoosh and Tutino.

Further, it appears undisputed that petitioner was mailed a copy of Mr. Scott's severance motion. *See* September 27, 2011 Brief for Respondent, p. 14. It may have been, as respondent asserts, that having already extensively, but unsuccessfully, argued for severance prior to the first trial, Mr. O'Rourke had no additional arguments to offer with respect to Mr. Scott's motion for severance. Id.  Indeed, petitioner has not articulated any argument which he or Mr. O'Rourke would have made with respect to Mr. Scott's severance motion that was not

previously offered, and rejected, in support of his own motion for severance prior to the original trial.

In any event, it has not been clearly established by the Supreme Court that a defendant has a right to be present at a severance motion, whether filed on his own behalf or that of a co-defendant.  On the contrary, it has been held that the failure of a defendant to be present for the argument of a motion for severance is harmless error.  *See* Mathews v. Crosby, 2005 WL 3556041, *18 (M.D. Fla. 2005) (Mathews has not shown how his absence from any hearing on the motion for severance thwarted a fair and just hearing or how his presence would have contributed to the fairness of the hearing. A defendant has no constitutional right to be present for proceedings involving purely legal matters"); Dixon v. Miller, 2005 WL 3240482, *13 (E.D.N.Y. 2005) ("Even if petitioner's rights were violated by his exclusion at this stage, such error would have to be deemed harmless, since petitioner cannot demonstrate that the error 'had substantial and injurious effect or influence in determining the jury's verdict . . . . Petitioner has not suggested any way that his presence could have altered the outcome of the proceeding or of the remainder of the trial").

Therefore, petitioner's motion for *habeas corpus* relief based upon the denial of his motion to sever or his lack of presence at Mr. Scott's motion to sever is denied.


**C.      Handling of Jurors and Jury Notes**

Petitioner asserts various claims relating to the handling of notes from the jury by Hon. Christopher Burns, the judge who presided over petitioner's trial. Petition [1], p. 22.  He also argues that Justice Burns improperly questioned a juror after observing what he thought

might be an interaction between the juror and an unidentified person in the courtroom gallery. Id., p. 13.

First, petitioner argues that Justice Burns erred in responding to a note from the jury which requested to have a portion of the jury instructions re-read to them. Petition [1], p. 22. In that note, the jury requested the "points of conviction for Murder in the 2nd Degree" (T. 686-87). Justice Burns determined that by "points", the jury meant "elements". Id. In addition to the elements of the murder charge, however, Mr. Dubois asked Justice Burns to include part of the identification instructions, which advised that to convict on the murder charge the jury would have to be able to identify Mr. Scott as being the shooter (T. 687). The following exchange took place:

> Mr. DuBois: "Well, I'm not asking you for the instruction on identification as a whole, meaning the ability to see. I'm not asking for that. I'm asking just for the part that says – where you told them that you have to be able to say that this is – he's the guy that did it and then the charge of murder. That's all I'm asking for.

> Justice Burns: I am saying the elements are: That on or about the time, date and place the defendant, Rickie Scott, personally or acting in concert with (sic) caused the death, et cetera, and did so with the intent to cause the death; and the same with Mr. Allen. That's what they asked for.

> Mr. DuBois: I guess I would – I don't think it's that specific. I think they asked for the points and I would just ask that in addition to those two elements they have to find it was in fact Rickie Scott that committed the crime. That's all I want. That's the only addition I want.

> Justice Burns: How is that different from what I just read?

> Mr. DuBois: Well, it's very different. Because you said that have to find that Rickie Scott is the one who did it, but that's different from the actual "You also have to find that not only was it Ricki Scott, but then you have to find that he committed these crimes." So it is different. That's all I'm asking for, judge."

(T. 688-89)

Justice Burns decided that he would provide the jury with "what they requested" and that "[i]f they want more, I'll give them more" (T. 689). After bringing the jury into the courtroom, Justice Burns asked the jury whether if by "points of conviction" they meant the elements, to which Juror No. 11 responded: "yes" (T. 690). Justice Burns then re-read the elements for murder in the second degree to the jury. Id.

Petitioner also asserts that Justice Burns' handling of other notes also improperly influenced the jury. Petition [1], p. 10. In this regard, petitioner points to the fact that after the jury first requested a read-back of the entire testimony from two witnesses, Justice Burns asked the jury if they could be more specific as to what portions of the testimony they wanted to hear (T. 681-82). The jury's subsequent note requested the portion of testimony from Tyquan Bolden[15] in which he described the shooter (T. 683).

After reading the subsequent note relating to Mr. Bolden's testimony, Justice Burns, along with counsel and the court reporter, attempted to identify which portions of Mr. Bolden's testimony responded to the jury's note (T. 682).  The record reflects that the jury was not present in the courtroom at the time. Id. Mr. DuBois stated: "I would just ask that in the event that there's something that's not read that either myself or Mr. O'Rourke seems to think was there, I would ask that before sending them away, we would be allowed to consult with Your Honor outside their presence" (T. 684).  In response, ADA Schwegler stated:

> "Judge, along those lines, I'm a little bit uncomfortable with these guys conversing in the box out there. I think you instructed them, maybe you can do it again, "Be as specific as you can. What you ask for will be read". But, you know, not that's good or go to the next one. Give them what they want without this mini-deliberation here."

Id.

---

[15]   Mr. Bolden was in the van with Williams when he was shot (T. 373-74).

Petitioner mistakenly interprets the prosecutor's comment as suggesting that a "mini-deliberation" by the jurors had been conducted in the courtroom. Petition [1], p. 10.  The record is clear that the jurors were not in the courtroom, and that the prosecutor's comments were in reference to defense counsel's request to review the testimony after it had been read back to the jurors, so that they might suggest other portions to be read back to the jury.

On direct appeal, the Fourth Department rejected these claims as not being preserved for appeal. People v. Allen, 93 A.D.3d at 1145. Again, even if petitioner were able to establish cause with respect to these procedurally barred claims, they would be denied on the merits because the record does not reflect that petitioner was denied a fair trial in any way because of the manner in which the jury notes were handled.

Generally, a state court trial judge is required to respond to a note from the jury as set forth in CPL §310.30.[16]  Federal *habeas* courts have routinely dismissed claims of a trial court's noncompliance with CPL §310.30 on grounds that they fail to implicate federal law, and a due process right in this context has not been clearly established by the Supreme Court. Bramble v. Connolly, 2011 WL 2471515, *7 (E.D.N.Y.  2011).

As discussed above, the record reflects that Justice Burns complied with §310.30. Moreover, petitioner has not established any prejudice arising from the manner in which Justice Burns handled the various notes from the jury. He responded to the notes after consulting with counsel and provided the jury with the information the jury had requested. Petitioner does not

---

[16]   CPL §310.30 provides, in part, that "[a]t any time during its deliberation, the jury may request the court for further instruction or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case. Upon such a request, the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper.

assert any infirmity with respect to original instructions provided to the jury. Justice Burns did

not refuse to provide any clarification of the original charge requested by the jury.  The record

does not suggest that the jury was under any misapprehension as they deliberated or that

petitioner was denied a fair trial in any way because of the manner in which the jury notes were

handled.

Petitioner also claims that Justice Burns improperly questioned one of the jurors

outside of his presence. In a conference with counsel held in chambers, Justice Burns advised the

attorneys that he had observed an individual seated in the front row of the gallery "who was

rocking back and forth and appeared to be trying to get the attention of the defendants. When

Defendant Scott turned around, they clearly had eye contact. The man winked at him and Scott

nodded his head in acknowledgement. The man then immediately looked at the jury and smiled.

And I looked at the jury and noticed that [Juror No. 11] . . . appeared to be looking in the

direction of the man. The juror immediately looked at me. I believe it invites inquiry as to

whether he is acquainted with this man or know him at all" (T. 572-73).

After some discussion with counsel as to what, if anything, he should do based

upon his observation, Justice Burns determined that an inquiry into whether Juror No. 11 was

familiar with the man in the gallery was necessary (T. 577). He also determined that inquiry was

necessary into whether Juror No. 11 was related to a criminal who had recently been in the news

who shared Juror No. 11's "fairly unusual" name (T. 578). Although that criminal was unrelated

to this case, Justice Burns noted that during jury selection Juror No. 11 did not respond

affirmatively when asked if he or any relative had ever been a defendant (T. 583-84).

Justice Burns then had Juror No. 11 brought into chambers, with counsel present

(T. 579). He noted his observation of the man in the gallery and asked Juror No. 11 if he was

familiar with that man (T. 580). Juror No. 11 stated that he did not know the man. Id.  Justice

Burns made it clear that he was inquiring because of what he had observed, and noted that the

attorneys did not see anything (T. 582). He also asked the juror if he felt intimidated or if had

gotten any impression that would affect his ability to be fair and impartial in the case (T. 581).

Juror No. 11 responded negatively. Id.

Justice Burns also inquired as to whether Juror No. 11 was related to an individual

with the same last name who had recently been in the news (T. 582). Juror No. 11 stated that the

person in the news was his second cousin. Id.  He stated that he had been away from Buffalo for

20 years and did not know that his cousin had been in jail until he read it in the newspaper a few

days earlier (T. 582-83).  Justice Burns again asked Juror No. 11 if there was anything about that

relationship that would affect him in deciding this case "for or against" (T. 583). Juror No. 11

responded: "No, absolutely not". Id.

Upon the conclusion of the inquiry, and after Juror No. 11 had been brought back

to the jury room, Mr. O'Rourke noted that although he had objected to the judge making any

inquiry, he had "to admit [Justice Burns] handled it very well" (T. 584). Petitioner has not

established, and the record does not reflect, that this inquiry had any impact on the deliberations

of Juror No. 11 or the jury as a whole.

The Supreme Court has held that a defendant need not be present at every *in

camera* proceeding. A defendant facing criminal charges has the "right to be present at a

proceeding whenever his presence has a relation, reasonably substantial, to the fullness of his

opportunity to defend against the charge . . . . [T]he presence of a defendant is a condition of due

process to the extent that a fair and just hearing would be thwarted by his absence, and to that

extent only". United States v. Gagnon, 470 U.S. 522, 526 (1985).

The question presented in <u>Gagnon</u> is analogous to this case. There, it was held that the defendant had no constitutional right to be present at an *in camera* discussion between a juror, the judge, and defense counsel regarding the juror's concern that the defendant had been drawing pictures of the jurors. <u>Gagnon</u>, 470 U.S. at 524, 527. The court stated that the defendant "could have done nothing had [he] been at the conference, nor would [he] have gained anything by attending." <u>Id.</u> at 527.[17]

Here, petitioner claims that he had a right to be present during the inquiry so that he could "assess the juror's demeanor and, perhaps, contribute to the questions asked of the juror". Petition [1], p. 15. Aside from this conclusory statement, petitioner does not articulate what he could have contributed or gained had he been present for the inquiry. Indeed, Justice Burns made it clear that this was his inquiry and that he would not open it "up to a cross-examination of the juror" (T. 578). As in <u>Gagnon</u>, petitioner's presence at the inquiry would have gained him nothing and may have been counterproductive.

In any event, petitioner's failure to be present during the *in camera* inquiry of Juror No. 11 did not constitute a violation of clearly established federal law as determined by the Supreme Court.  Petitioner's various claims relating to the handling of the jury, considered separately and in the aggregate, do not established that he was deprived of a fair trial in any way.

---

[17]    Respondent argues that petitioner's presence at the inquiry with Juror No. 11 may have intimidated the juror and inhibited candor. Respondent's Memorandum of Law [6], p. 18. This was a concern of the Court in <u>Gagnon</u> as well, which stated: "Indeed, the presence of Gagnon and the other respondents, their four counsel, and the prosecutor could have been counterproductive". <u>Gagnon</u>, 470 U.S. at 527.

**D.      Prejudicial Testimony**

Petitioner argues that Justice Burns erred by failing to strike allegedly prejudicial testimony by Mr. Cobb  and Mr. Romer. Petition [1], p. 11. In both instances, the testimony was elicited on cross-examination in response to questions posed by Mr. DuBois.

Mr. DuBois, who was seeking to discredit Mr. Cobb's testimony, asked Mr. Cobb why he did not go to the police immediately after witnessing the shooting instead of waiting two years to make a statement (T. 491-92). Initially, Mr. Cobb stated that he did not call the police because he "didn't do it" (T. 491). Pressing the issue, Mr. DuBois asked Mr. Cobb: "I want to know how are you're here . . .  What lead you to be here today" (T. 492). After persistent questioning by Mr. DuBois, Mr. Cobb responded that he made a statement "mostly" because petitioner was "around my Mom" (T. 492). When asked to explain, Mr. Cobb stated: "Kevin was around my mother['s] house dating one of my cousins and I figured that he was trying to rob my house" (T. 493).

Mr. O'Rourke objected to this testimony by Mr. Cobb. However, Justice Burns overruled the objection stating that Mr. Cobb was asked for his thought process, so he was allowed to testify to it (T. 493). Petitioner argues that this testimony was prejudicial because it insinuated petitioner's propensity to commit crime. Petition [1], p. 11.  He also asserts that Justice Burns erred by failing to provide a limiting instruction to the jury. Id.  On appeal, the Fourth Department held that petitioner failed to preserve this issue for review. People v. Allen, 93 A.D.3d at 1146.

Similarly, Mr. DuBois sought to discredit the testimony of Mr. Romer by suggesting that his was testifying so that he could receive a less severe sentence for his conviction of an unrelated crime (T. 274). The following exchange took place:

| Mr. DuBois: | "Do you know why you were looking at 25 years as of yesterday and now you have 22 years? Do you know how that happened? |
| Mr. Romer: | I mean a lot of things lead to that. |
| Mr. DuBois: | Like what? |
| Mr. Romer: | My wife being assaulted, death threats. Showing the paperwork. I don't care less about that. |
| Mr. DuBois: | Because your wife was assaulted and you received death threats, Mr. Schwegler was generous enough to cut three years off your sentence; is that your testimony? |
| Mr. Romer: | That's not what it was. Like I said there was a lot of things that lead to that." |

Id.[18]

Mr. O'Rourke again objected. However, Justice Burns allowed the questioning, as it explained why the witness was testifying (T. 274-75). Mr. DuBois was entitled to question Mr. Cobb and Mr. Romer about their motivation to testify against his client. In fact, the motivation of a witness in testifying, including his possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination. Henry v. Speckard, 22 F.3d 1209, 1214 (2d Cir. 1994).

Even if it were to be considered an error to allow the testimony, such error was harmless. The erroneous admission of evidence is harmless if the court "can conclude with fair assurance that the evidence did not substantially influence the jury". United States v. Garcia, 291 F.3d 127, 143 (2d Cir. 2002). In determining whether the erroneous admission evidence was harmless, the following factors are to be considered: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the

---

[18]   Mr. Romer was not asked, and he did not state, who assaulted his wife or made the death threats. There is nothing in the record attributing this conduct to petitioner or Mr. Scott.

importance of the wrongly admitted [evidence]; and (4) whether such evidence was cumulative of other properly admitted evidence". United States v. Ivezaj, 568 F.3d 88, 98 (2d Cir. 2009).

Here, the strength of the prosecution's case against petitioner was strong. Three witnesses each testified that they observed petitioner give Mr. Scott a gun, and then saw Mr. Scott walk to the street and shoot Mr. Williams (T. 236, 396-401, 477). Two other witnesses, both off-duty law enforcement officers, placed petitioner at the scene at the time of the shooting (T. 338-40, 536). With respect to the second factor, the prosecution played no role in the introduction of the challenged testimony as in both instances it was elicited by defense counsel.

Moreover, the challenged statements did not play an important role in the case. In each instance, the challenged testimony consists of isolated statements that were a small portion of the cross-examination which primarily sought to discredit the witnesses by detailing their respective criminal history (T. 240-54, 486). In any event, this testimony did not go to any of the elements of the charged crimes or defenses. Indeed, it may be argued that the jury could have discounted Mr. Cobb's testimony if they determined that he made the statement to the police to keep petitioner away from his mother's house, and not because he actually witnessed the crime. Similarly, the jury could have determined that Mr. Romer's testimony was unreliable because he was testifying to obtain a lesser sentence.

Upon review of the record as a whole, the isolated statements by Mr. Cobb and Mr. Romer regarding their motivation to testify were not central to the case. The record does not reflect that the isolated statements being challenged substantially influenced the jury's decision. This is particularly so in light of the fact that the testimony as to the events of Mr. William's murder provided by Mr. Cobb and Mr. Romer was consistent with each other and with the testimony provided by Mr. Reed.

Because there is nothing in the record to indicate that the admission of the challenged testimony violated the "fundamental fairness" of petitioner's trial (Estelle v. McGuire, 502 U.S. 62, 72 (1991)), petitioner's request for *habeas corpus* relief on this ground is denied.[19]

**E.      Videos of the Scene on Main Street**

Petitioner also argues that he was denied the right to present a defense because Justice Burns denied his request to admit two videos showing events inside the Tralf and depicting the scene on Main Street outside the Tralf (T. 550, 585). Petitioner does not claim that the videos include the shooting, or any of the defendants or witnesses involved in the trial. Similarly, petitioner does not claim that the videos depict the area at which the shooting or the events leading up to the shooting occurred. Instead, petitioner argues that the videos would show the "pandemonium" occurring in the area, which would lend credence to his defense of misidentification. Petition [1], p. 12-13.

After reviewing the videos, Justice Burns determined that they did not "show anything relevant inside [the Tralf] other than that there was a crowd there, we know that. The [videos] outside are not relevant because it's in a different location than the incidents that took place with regard to this matter. What happened on Main Street in front of the Tralf is irrelevant [as to what happened] on Pearl Street behind the Tralf. It's a block away" (T. 587). He stated that there had already been significant testimony as to the scene involved in the shooting and ruled that the videos were not competent evidence. Id.

Although a defendant has the fundamental right to present evidence and call witnesses in his own defense, *see* Chambers v. Mississippi, 410 U.S. 284, 302 (1973), state

---

[19]   Although petitioner argues that the testimony of Mr. Cobb, Mr. Romer, and Mr. Reed was defective and that Mr. O'Rourke was ineffective for failing to have it suppressed in its entirety (Motion for Stay [22-1], pp. 180-87 of 213), he fails to articulate any adequate basis warranting suppression of this testimony.

courts are permitted "to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability - even if the defendant would prefer to see that evidence admitted". Crane v. Kentucky, 476 U.S. 683, 690 (1986). In the context of a *habeas corpus* petition, an erroneous evidentiary ruling does not rise to the level of constitutional error unless "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist". Jones v. Stinson, 229 F.3d 112, 120 (2d Cir.2000).

The exclusion of the videos did not prevent petitioner from presenting a defense in this case. Testimony had been elicited from several witnesses describing the scene as chaotic (T. 540), not calm (T. 410), a riot (T. 538), a mini-riot (T. 546), leading Justice Burns to question whether the videos were merely cumulative (T. 551). In any event, because the videos depict the area on Main Street around the block from where the events involved in the trial took place, when evaluated in the context of the entire record, they do not constitute evidence which would create a reasonable doubt as set forth in Jones.

Petitioner's request for *habeas corpus* relief in this ground is denied.


**F.      Insufficiency of the Evidence**

Finally, petitioner argues that the evidence was "constitutionally insufficient" with respect to his conviction for murder in the second degree because the prosecution did not establish that he acted with the intent to cause the death of Mr. Williams. Petition [1], p. 20.

In reviewing a sufficiency of evidence claim, the court must "determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law

satisfy the proof and burden requirements for every element of the crime". People v. Bleakley, 69 N.Y.2d 490, 495 (1987).  Ultimately, the question is whether the evidence adduced at trial was sufficient to support the conviction.  In this regard, a petitioner "is entitled to *habeas corpus* relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt". Policano v. Herbert, 507 F.3d 111, 115-16 (2d. Cir. 2007) *quoting* Jackson v. Virginia, 443 U.S. 307, 324 (1979).  "[A] petitioner bears a very heavy burden in convincing a federal *habeas* court to grant a petition on the grounds of insufficiency of the evidence". Policano, 507 F.3d at 116.

Here, the evidence is sufficient to support petitioner's conviction for murder in the second degree. As discussed above, three witnesses testified that they saw Mr. Kemp say that he wanted Mr. Varner killed; that Mr. Scott stated he would do it; that petitioner then provided Mr. Scott with a gun which Mr. Scott used to kill Mr. Williams (thinking it was Mr. Varner) (T. 236, 396-401, 477).[20] The jury could reasonably infer that in providing the gun to Mr. Scott, right after Mr. Scott agreed to kill Mr. Varner, petitioner intended Mr. Scott to use the gun to kill Mr. Varner. Under New York law, such conduct is sufficient to support a conviction of murder in the second degree. *See* People v. McKnight, 306 A.D.2d 546, 547 (3d Dept. 2003) (supplying a deadly weapon knowing that weapon was to be used to commit a murder is sufficient to establish defendant's criminal intent for murder in the second degree).

Petitioner's request for *habeas corpus* relief on this ground is also denied.

---

[20]   Petitioner claims that the testimony of these witnesses was "contradictory and, therefore, not credible". Petition [1], p. 15. The petitioner does not identify, and the record does not reflect, any meaningful contradictions in the testimony of these witnesses.

## CONCLUSION

For the reasons discussed above, petitioner's motion for a stay and abeyance [22] is

denied, and the petition [1] is also denied. Pursuant to 28 U.S.C. § 1915(a)(3), I hereby certify

that any appeal from this Order would not be taken in good faith. Therefore, leave to appeal to

the Court of Appeals as a poor person is denied.  Coppedge v. United States, 369 U.S. 438, 82 S.

Ct. 917, 8 L. Ed.2d 21 (1962).  Further requests to proceed on appeal as a poor person should be

directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance

with Rule 24 of the Federal Rules of Appellate Procedure.


Dated: October 12, 2016

/s/ Jeremiah J. McCarthy

JEREMIAH J. MCCARTHY
United States Magistrate Judge.